IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN ANNE WOODWARD,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant.<br>_____/ | No. 2:14-CV-0811-CMK<br><br><br><br>MEMORANDUM OPINION AND ORDER |

　　　　Plaintiff, who is proceeding with retained counsel, brings this action under 42 U.S.C. § 405(g) for judicial review of a final decision of the Commissioner of Social Security. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c).  Pending before the court are plaintiff's motion for summary judgment (Doc. 12) and defendant's cross-motion for summary judgment (Doc. 13).

/ / /

/ / /

/ / /

## I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on September 18, 2009.  In the application, plaintiff claims that disability began on August 1, 2006.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on June 13, 2012, before Administrative Law Judge ("ALJ") L. Kalei Fong.  In a July 20, 2012, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): thoracic outlet syndrome; right carpal tunnel syndrome; Hepatitis C with Stage II fibrosis; attention deficit hyperactivity disorder; depressive disorder; anxiety disorder; and alcohol dependence and abuse in partial remission;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: she can perform light work except: she can frequently balance, bend, crouch, crawl, kneel, stoop, and climb ramps and stairs; she can only occasionally climb ladders, ropes, and scaffolds; she must avoid constant/abrupt movements of the neck; she can only occasionally overhead reach with the left arm; she can frequently handle and finger with the right arm/hand; she must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc., and hazards; she can sustain simple repetitive tasks; she can work in two-hour increments in an eight-hour day; she can work in a non-public environment with occasional public contact;

4. Considering the claimant's age, education, work experience, residual functional capacity, and the Medical-Vocational Guidelines, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on February 3, 2014, this appeal followed.

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

(9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### III.  DISCUSSION

Plaintiff argues: "[T]he ALJ's finding that Ms. Woodward was limited to frequent handling and fingering with the right hand, occasional overhead reaching with the left arm, occasional public contact in a non-public environment, and no abrupt or constant neck movements precludes reliance on the Grids at Step 5 of the sequential analysis."[1]  Specifically, plaintiff contends that the ALJ erred in relying on Medical-Vocational Rules 202.21 and 202.14.

/ / /

/ / /

/ / /

---

[1] Notably, plaintiff raises no argument concerning the ALJ's evaluation of the medical opinion evidence or adverse credibility finding.

1   The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about
2 disability for various combinations of age, education, previous work experience, and residual
3 functional capacity. The Grids allow the Commissioner to streamline the administrative process
4 and encourage uniform treatment of claims based on the number of jobs in the national economy
5 for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458,
6 460-62 (1983) (discussing creation and purpose of the Grids).

7   The Commissioner may apply the Grids in lieu of taking the testimony of a
8 vocational expert only when the Grids accurately and completely describe the claimant's abilities
9 and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.
10 Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the
11 Grids if a claimant suffers from non-exertional limitations because the Grids are based on
12 exertional strength factors only.[2] See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).
13 "If a claimant has an impairment that limits his or her ability to work without directly affecting
14 his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered
15 by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,
16 Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids

---

[2] Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a). "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. §§ 404.1567(b) and 416.967(b). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. §§ 404.1567(c) and 416.967(c). "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. See 20 C.F.R. §§ 404.1567(d) and 416.967(d). "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically, where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Citing Social Security Rulings 83-10, 83-12, 83-14, 83-15, and 96-8p, the ALJ concluded that plaintiff's non-exertional limitations have "little or no effect on the occupational base of unskilled light work."  According to plaintiff, the ALJ's own findings – that plaintiff can frequently handle and finger with the right hand, occasionally reach overhead with the left arm, occasionally have public contact in a non-public environment, and never engage in abrupt or constant neck movements – constitute non-exertional limitations precluding application of the Grids.  The issue, then, is whether any of these limitations impact the claimant's capability to perform the exertional requirements of light work.  If so, then the ALJ erred in applying the Grids.

**Physical Impairments**

As to plaintiff's ability to reach overhead with the left arm, the ALJ summarized the record as follows:

> The claimant is seen multiple times in treatment with primary care physician Dr. Martin Kuersten (Exhibit 1F).  She sees Dr. Kuersten five times in 2005, three times in 2006, and once in May 2007.  Once she complains of left shoulder pain, with physical examination showing full range of motion of the shoulder, end point tenderness with elevation above the shoulder, mild tenderness with Hawkins, and some tenderness to palpitation (Exhibit 1F/7).  This is diagnosed as left shoulder bursitis v.

>tendonitis, doubt rotator impingement in September 2005, for which an injection is given. . . .

The ALJ also commented on records from Hilltop Medical Clinic:

>The claimant is seen by treating sources at Hilltop Medical Clinic for a variety of temporary ailments from November 2006 to August 2009 (Exhibit 4F). She is seen for left elbow pain once, in November 2006, noting she had it for months, using Advil, and a brace to relieve her symptoms, but the dog chewed the brace (Exhibit 4F/1). Physical examination findings of the elbow are tenderness, painful range of motion; she is diagnosed with tendonitis, encouraged to get a new brace and Ibuprofen.

As to plaintiff's ability to handle and finger with the right hand, the ALJ first noted: ". . .Carpal tunnel syndrome is demonstrated to affect only the right hand and was mild in nature." The ALJ then commented on records from Dr. Kuersten:

>. . .She is also seen for pain in the hands, waking up at night with numbness or pain, using braces at night for relief. Findings are full range of motion, good and equal grip strength, positive Tinel's and Phalen's signs, no swelling (Exhibit 1F/3, 7/2006). . . .

As to plaintiff's neck impairments, the ALJ stated:

>. . .Her symptoms improve with treatment, in particular her degenerative disease of the cervical spine and thoracic outlet syndrome which received significant treatment being the subject of a Worker's Compensation and Disability claim, appear to resolve, and thereafter appear to flare occasionally, resolving again with treatment such as medications, physical therapy, chiropractic care. . . .

The ALJ then commented on records from Dr. Budhram related to neck issues:

>From November 2011 through April 2012, claimant is under the care of Dr. Harold Budhram (Exhibit 20F). The records show treatment for neck pain . . . and other temporary conditions with medication. . . . Physical examination findings sometimes reflect spasm, tenderness of the cervical spine with left radicular symptoms, but normal strength and grip, some loss of sensation to light touch. In January she requests a note to return to work. . . .

///

///

///

1        Touching on all of plaintiff's physical impairments discussed above, the ALJ then

2 summarized records related to plaintiff's Worker's Compensation claim:

3    Worker's Compensation treatment records of Dr. Michael Moore, from
     April 2007 through October 2009, shows the claimant diagnosed with mild
4    carpal tunnel syndrome bilateral, thoracic outlet syndrome, work-related
     upper arms, neck, and back myofascial pain syndrome, degenerative disc
5    disease of the cervical spine, . . . and cervical radicular pain (Exhibit 6F).
     There is regular treatment initially but by 2009 she cancels or does not
6    keep appointments six times, has some flares for which physical therapy
     and medications are recommended. . . .(Exhibit 6F/4, 7, 13, 16).  Physical
7    examination shows she is alert and appropriate, exhibits normal strength
     but demonstrates positive thoracic outlet syndrome, some decrease in
8    range of motion of the neck, decrease in sensation of the finger tips, and
     tenderness.  With physical therapy, traction, and other exercises, there is
9    improvement, a reduction of symptoms of numbness and soreness in the
     arms and hands, and she is undertaking physical activity such as ice
10   skating, walking in a creek bed.  This record includes an MRI of the
     cervical spine January 2007 evidencing severe neural foraminal narrowing
11   with no cord compression, mild canal narrowing C5-6, and mild neural
     foraminal narrowing, and canal narrowing at other vertebral levels
12   (Exhibit 6F/33).  EMG/NCS, from July 2007, shows no evidence of
     cervical radiculopathy, mild right carpal tunnel syndrome without motor
13   involvement, no evidence of left carpal tunnel syndrome nor other upper
     arm entrapment neuropathy (Exhibit 6F/38).
14
Finally, the ALJ discussed the medical opinion evidence concerning plaintiff's physical
15
impairments:
16
     The State Agency non-examining doctor opined she can frequently
17   balance, bend, crouch, crawl, kneel, stoop, and climb ramps and stairs but
     only occasionally climb ladders, ropes, and scaffolds; she must avoid
18   constant/abrupt movements of the neck; can only occasionally overhead
     reach with the left arm; can frequently handle and finger with the right
19   adm/hand; must avoid concentrated exposure to fumes, odors, dust, gases,
     poor ventilation, etc., and hazards (dangerous machinery, unprotected
20   heights, etc.).  Great weight is accorded this opinion, being sustained by
     the record of good care, resolving with medications, injections, physical
21   therapy, chiropractic care, the severe symptoms from her degenerative disc
     disease of the cervical spine, thoracic outlet syndrome leaving a condition
22   which now appears to flare occasionally, particularly when the claimant is
     under stressful emotional and physical conditions, such as is revealed in
23   April 2012 when she claims her neck is killing her, and she is providing
     round the clock care for her husband, losing any help there was in his care.
24   It is sustained . . . by diagnostic imagery and testing showing she has no
     carpal tunnel syndrome in the left hand, simply the right, and it is mild; as
25   well the testing shows no evidence of cervical radiculopathy nor other
     upper arm entrapment neuropathy.
26

Based on this record, the ALJ's conclusion that plaintiff's physical impairments do not impact her ability to perform the exertional requirements of light work is supported by substantial evidence. Most notably, there is no medical opinion evidence to the contrary.

**Mental Impairments**

Turning to plaintiff's mental impairments, the ALJ generally summarized the record as follows:

> The record overall demonstrates that the claimant has sought inconsistent care over the years for long-standing issues of depression and anxiety, adult attention deficit hyperactivity disorder, and struggled with recovery from alcohol dependence. She regularly ceases psychiatric medications due to her own decisions, or by running out of them. Several times in the medical records it is noted that her symptoms are due to untreated anxiety and depression, and a number of times with regard to untreated or unmanaged attention deficit hyperactivity disorder. There is no evidence she ever engages in and sustains treatment for ADHD. There are several instances where she fails to make scheduled appointments, or cancels, is even discharged from care for her psychiatric problems evidencing further non-compliance with treatment needed to manage her impairments. Mental status examinations, when appropriately treated, reveal the claimant's mental conditions within normal limits with occasional exhibitions of anxiety, or psychomotor agitation or tearfulness or pressured speech or hyperkinetic, mainly due to the current situations which are causing her stress. Heightened symptoms also generally correspond to a cessation of treatment. These conclusions are supported by Global Assessment of Functioning scores, the lowest of which is 60, moderate symptoms and the highest of which is 75, slight, temporary symptoms.

After discussing the treatment records in detail, the ALJ stated:

> This scattered record of inconsistent treatment by multiple providers, peppered by claimant's choice to cease medications and fail to make appointments, challenges a finding of a severe impairment that is as intense, persistent, or limiting as she alleges. When combined with mental status examinations which show generally and alert, oriented, cooperative, competent individual who is occasionally noted to display anxiety, or other symptoms of her impairments, her allegations cannot be fully credited. When considered in light of her activities of daily living, which are rather normal – raising a child and involved in her school activities, doing a good range of household tasks, driving, shopping, interacting with friends and family, and after a stroke event, providing full or partial care to a mentally and physically disabled husband, it cannot be said that the claimant's symptoms occur to such a frequency or degree as to prohibit engagement in work-related tasks on a regular and sustained basis. In addition, there is the evidence of alcohol dependency to some degree in early partial

8

remission. According to her testimony February 22, 2012, is her new sober date due to a relapse; with prior period of sobriety being one year, and two years.

Finally, as to the opinion evidence relating to plaintiff's mental impairments, the ALJ noted the following: (1) examining psychologist Sidney Cormier assessed a GAF score of 60 in January 2010; (2) non-examining doctor R. Paxton opined that plaintiff should work in a non-public environment with only limited public contact; and (3) examining doctor Robert Boyle concluded that plaintiff would have difficulty working with the public.

As with plaintiff's physical impairment, the ALJ's conclusion that plaintiff's mental impairments do not impact her ability to perform the exertional requirements of light work is also supported by substantial evidence, notably the lack of medical opinion evidence indicating otherwise. As most, plaintiff's mental limitations are moderate and do not preclude application of the Grids. See Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007) (rejecting argument that ALJ was required to obtain vocational expert testimony in lieu of applying the Grids in light of moderate mental limitations).

## IV. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 12) is denied;

    2.    Defendant's cross-motion for summary judgment (Doc. 13) is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED: October 31, 2014

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE